

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(DENVER DIVISION)

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

FEB 09 2023

JEFFREY P. COLWELL
CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Crim No. 1:17-cr-00235-PAB-1 |
| | ) |
| JOHNNY JOE JUAREZ, | ) |
| | ) |
| Defendant. | ) |

## MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) AND THE FIRST STEP ACT OF 2018

COMES Movant, JOHNNY JOE JUAREZ ("Juarez"), appearing *pro se,* and in support of this memorandum would show as follows:

## I. JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id.* However, Congress has allowed an exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by

the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

## II. STATEMENT OF THE CASE

### A.    Procedural Background

On July 12, 2017, a grand jury sitting in the United States District Court for the District of Colorado, Denver Division, returned a twelve (12) count Indictment charging Juarez and four other co-defendants. See Doc. 25.[1] Count 1 charged Juarez with Conspiracy to Possess with Intent to Distribute 500 Grams or More of A Mixture and Substance Containing a Detectable Amount of Methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(A). *Id.* Counts 6 and 8 charged Juarez with Possession with Intent to Distribute 50 Grams or More of Methamphetamine, Methamphetamine (Actual), and A Quantity of A Mixture and Substance Containing A Detectable Amount of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and (b)(1)(C). *Id.* Counts 7, 9, and 10 charged Juarez with Possession with Intent to Distribute 50 Grams or More of Methamphetamine and Methamphetamine (Actual),

---

[1]

"Doc." refers to the Docket Report in the United States District Court for the District of Colorado, Denver Division in Criminal No. 1:17-cr-00235-PAB-1, which is immediately followed by the Docket Entry Number.

in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). *Id.* Count 11 charged Juarez with Possession with Intent to Distribute 50 Grams or More of Methamphetamine, Methamphetamine (Actual), A Quantity of A Mixture and Substance Containing A Detectable Amount of Cocaine and Heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A),(b)(1)(C), and 2. *Id.* Count 12 charged Juarez with Possession of Firearms In Furtherance of A Drug Trafficking Crime, in violation of 18 U.S.C. §§ 924(c)(1)(A), (c)(1)(A)(I), and 2. *Id.* The Indictment also contained a Forfeiture Allegation pursuant to 21 U.S.C. §§ 853(a)(1) and (a)(2). *Id.*

On August 30, 2018, a Change of Plea Hearing was held and Juarez pled guilty to Counts 1, 9 through 12 of the Indictment, pursuant to a written Plea Agreement. See Docs. 205, 206.

On May 24, 2019, Juarez was sentenced to a total term of 180 months' imprisonment, 5 years Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $500. See Docs. 265-267.

On June 26, 2019, Juarez filed a letter re: Notice of Appeal, which was dismissed by the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") on November 13, 2019. See Docs. 274, 280, 284, 285.

## B.   Statement of the Relevant Facts

### 1.   Offense Conduct

The parties stipulate and agree as follows:

As part of a DEA operation to purchase guns and drugs from individuals known by a confidential source (CS) to be sources of those items, the CS met with Jesus Leonell Gonzalez ("Gonzalez") on December 13, 2016. The CS contacted Gonzalez by phone in order to purchase a firearm and methamphetamine from him and asked to meet in Lakewood, Colorado, where the CS was staying. On that date, the CS purchased a firearm for $350 and approximately one half pound of methamphetamine (DEA Exhibit One) for $2,250 in Lakewood, Colorado, that according to the CS were both provided to him by Juarez. Gonzalez later told the CS in a recorded call that Juarez only paid him $50 for conducting this transaction.

On December 28, 2016, the CS reported to the DEA that Gonzalez wanted to sell the CS another rifle and more methamphetamine. After making the report, the CS received a call from Gonzalez, who instructed the CS to meet at the intersection of Mississippi Avenue and Tejon Street in Denver, Colorado. The CS was given funds to make the purchases. Gonzalez sold the CS a firearm on that date. On the same date, Gonzalez provided the CS with a phone number for "Yoni," subsequently identified as co-defendant Susana Lara Guerra. Previously, Gonzalez told the CS that Yoni was Juarez's girlfriend and that when he wanted to do "business" with Juarez, he went through Yoni.

After the CS texted Yoni, Juarez called the CS at approximately 6:56 p.m. on December 28, 20016. Juarez told the CS that he wanted to meet with the CS to discuss drug business. Juarez met with the CS in Denver at approximately 8:30 p.m. on December 28, 2016. After the meeting, the CS reported to the DEA that: (1) Juarez was willing to sell methamphetamine to the CS for $450 an ounce; (2) Juarez did not have a pound to sell at the moment, but that Juarez could sell a smaller amount; (3) Juarez was also willing to sell the CS cocaine for $1,000 an

4

ounce; and (4) Juarez told the CS that the CS should contact Juarez whenever the CS was ready to buy.

The CS called Juarez at approximately 3:08 p.m. on December 29, 2016. Juarez called the CS back at approximately 4:20 p.m. Juarez asked if the CS was "ready." When the CS responded "yes," Juarez told the CS "I got a hotel and I gotta go over there and I will get whatever you want." The CS called Juarez again at approximately 4:23 p.m. The CS told Juarez that the CS wanted to grab a "couple." Juarez asked: "You want a couple of the pow . . . how many you need?" The CS responded "two" and Juarez then asked whether the CS was "gonna have the loot." The CS said that he did and then asked for "four" of the "other." Juarez told the CS "I have three of them." "Pow" referred to powder cocaine, "loot" referred to money, and that the "other" was a reference to methamphetamine. Based on Juarez's prior representation that he did not have pound quantities to sell, the references to "two,""four" and "three" were references to ounce quantities of drugs.

In a subsequent call on the same date, Juarez answered a call from the CS and they arranged to meet for the drug transaction near a convenience store in Denver. During the meeting, Juarez sold the CS approximately 3 ounces of methamphetamine (DEA Exhibit Two) and 2 ounces of cocaine (DEA Exhibit 3).

Juarez next spoke to the CS on January 17, 2017 to coordinate a meeting in which the two could discuss the CS' previously stated desire to purchase a pound of methamphetamine. The two then met to discuss the details of the deal at approximately 8:30 p.m. The CS advised agents after the meeting that Juarez told him that he could sell the CS a pound of methamphetamine for $5,000. The CS told Juarez that the CS would need a pound of methamphetamine on January 19, 2017. Juarez agreed to try to make a pound available to the CS on that date.

During the afternoon of January 19, 2017, Juarez contacted the CS to set up a meeting for the methamphetamine deal. On the same date, Juarez directed the CS "to meet near First and Sheridan in 20 minutes." At approximately 8:00 p.m., the CS arrived at Carniceria Los Tapatios, near

the intersection of First Avenue and Sheridan in Lakewood, Colorado where he met with Juarez. Surveillance officers observed Juarez arrive at that location at approximately 8:10 p.m. whereupon the CS' vehicle pulled behind Juarez's truck and the two drove away in tandem and arrived outside a residence in Lakewood. Juarez then got out of his truck and walked to the CS' vehicle that was parked behind it. Surveillance officers observed Juarez drop a bag on the ground, pick it up and enter the CS' vehicle. Inside the vehicle, Juarez told the CS "I can give it to you for 48," as in $4,800. Juarez also described the methamphetamine as "Bomb" and "Fire," which is a way drug dealers have been known to describe the high potency of their product. The CS gave Juarez $4,800 in exchange for a bag containing a crystalline substance that Juarez represented to be methamphetamine (DEA Exhibit 4).

On March 9, 2017, the CS introduced Juarez to an undercover DEA task force officer, hereinafter referred to as the "UC." At approximately 6:10 p.m., the CS called Juarez and explained that the one pound of methamphetamine previously sold to the CS by Juarez had been for the UC. The CS also asked if Juarez could bring two of "the other," coded language that the CS and Juarez used to refer to two ounces of cocaine. Juarez agreed to meet with the CS and the UC to sell them a pound of methamphetamine and two ounces of cocaine. At approximately 7:30 p.m. on the same date, the CS called Juarez and Juarez told the CS to meet him on the street behind a convenience store located at 95 Sheridan Boulevard in Lakewood, Colorado. The UC and the CS then drove to that location. They arrived at approximately 7:45 p.m. The CS again called Juarez and described where the CS and the UC were parked and what vehicle they were driving. Juarez said he would walk over to them. At about the same time, the UC saw a man approach the car from the north. When he got to the car, the man got into the rear seat. The UC saw the man and identified him as Juarez. Inside the car, Juarez handed the UC a plastic bag containing one pound of a crystalline substance Juarez represented to be methamphetamine (DEA Exhibit 5) and two ounces of a white powdery substance Juarez represented to be cocaine (DEA Exhibit 6). In exchange, the UC paid Juarez $6,700. When the transaction was finished, Juarez told the UC to text him on his phone with a reminder of who the UC was. Juarez then got out of the vehicle.

On June 21, 2017, the same UC conducted a half-pound methamphetamine controlled purchase from Juarez for $2,600. The deal took place at about 2:00 p.m., near Sheridan Blvd, and 1st Avenue in Lakewood, Colorado (DEA Exhibit 8). Co-defendant, Gonzalo Lara Guerra drove Juarez to this location and was present during this transaction. Also during this purchase, the UC told Juarez he had several large orders for methamphetamine he needed to fill and asked if he, the UC, could get two pounds of methamphetamine from Juarez sometime the following week. Juarez told the UC that was not a problem and that the UC should call him.

On June 29, 2017, following further negotiations between the UC and Juarez, Juarez agreed to sell the UC two pounds of methamphetamine. The meeting took place in Lakewood, Colorado and co-defendant Gonzalo Lara Guerra again drove Juarez to this meeting. Both defendants were arrested at the scene and agents recovered approximately two pounds of methamphetamine from Juarez (DEA Exhibit 9).

Simultaneously with the arrests, agents executed a search warrant at Juarez's residence located at 5630 West 2nd Avenue in Lakewood, Colorado. During that search, agents and officers recovered, inner alia, the following items from Juarez's father, co-defendant Faustino Juarez's bedroom: approximately 600 grams of cocaine (DEA Exhibits 10 and 14); approximately one pound of methamphetamine (DEA Exhibit 11); approximately 110 grams of cocaine base or "crack" cocaine (DEA Exhibit 12); and approximately 20 grams of heroin (DEA Exhibits 15 and 16). Also, recovered in close proximity to the drugs, drug packaging materials and an electronic digital scale was a stolen Glock Model 17, 9-millimeter semiautomatic pistol .4 a loaded ammunition magazine and several loose rounds of 9-millimetre ammunition. During his post arrest interview with agents, Juarez admitted that the drugs, pistol and ammunition found in his father's bedroom were his.

See Doc. 206 at 7-9.

2.     Plea Proceeding

On May 24, 2019, a Change of Plea Hearing was held before Chief Judge

Philip A. Brimmer. See Doc. 205. Juarez entered a guilty plea as to Counts 1, 9

through 12 of the Indictment, pursuant to a written Plea Agreement. See Doc. 206.

In exchange for Juarez's guilty plea, the government agreed to the following: (1)

dismiss with prejudice Counts 6 through 8 of the Indictment as to Juarez only; and

(2) Juarez received a 3-level reduction for acceptance of responsibility under USSG

§§ 3E1.1(a) and (b) . *Id.* The case was referred to the U.S. Probation Office for the

preparation of the PSR.[2]

3.     Presentence Report Calculations and Recommendations

The U.S. Probation Office prepared Asante's PSR on November 2, 2018, which

was revised on May 15, 2019. See Doc. 232. The 2018 Guidelines Manual,

incorporating all guideline amendments, was used to determine Asante's offense level

pursuant to USSG § 1B1.11. See PSR ¶ 46. Counts 1 through 9 were grouped

together pursuant to §§ 3D1.1(a)(1) and 3D1.2(d) herein Count Group 1. See PSR ¶

60. Count Group 1: Counts 1 through 9 calls for a Base Offense Level of 36 pursuant

to USSG §§ 2D1.1 (a)(5) and (c)(2). See PSR ¶ 61. In accordance with § 3B1.1(a),

---

[2]

"PSR" refers to the Presentence Report in this case, which is immediately followed by the
paragraph ("¶") number.

his offense level was increased by four (4) because he was an organizer or leader. See

PSR ¶ 64. The PSR calculated Juarez's Adjusted Offense Level to be level 40. See

PSR ¶ 66. Juarez received a three (3) level reduction for acceptance of responsibility

pursuant to USSG §§ 3E1.1(a) and (b). See PSR ¶¶ 68-69. Count Group 2: Count 12:

Possession of Firearms In Furtherance of A Drug Trafficking Crime and Aiding and

Abetting Same, the guideline sentence is five (5) years (60 months), consecutive to

any other sentence pursuant to USSG § 2K2.4(b). See PSR ¶ 71. The PSR calculated

Juarez's Total Offense Level to be level 37. See PSR ¶ 70. Juarez's total criminal

history points of 6; placed him in Criminal History Category III. See PSR ¶ 86. Based

upon a Total Offense Level of 37 and a Criminal History Category of III, the guide

line imprisonment range was 262 to 327 months as to Counts 1 through 9 consecutive

to 60 months as to Count 12. See PSR ¶ 121.

    4.   Sentencing Proceeding

On May 24, 2019, a Sentencing Hearing was held before Chief Judge Philip

A. Brimmer. See Doc. 265. At sentencing, the Court sentenced Juarez to: 120 months

as to Counts 1 and 9 through 11, to run concurrently with each other, and 60 months

as to Count 12, to run consecutively to Counts 1 and 9 through 11, for a total term of

180 months; followed by 5 years of Supervised Release. See Doc. 267. The Court

also ordered a payment of Mandatory Special Assessment Fee of $500.00. *Id.*

5.  <u>Appellate Proceeding</u>

Although Juarez's Plea Agreement contained a waiver of his right to appeal,

he still filed a Notice of Appeal. As a response, the government then filed a Motion

to Enforce the Appeal Waiver in the Plea Agreement pursuant to *United States v.*

*Hahn*, 359 F.3d 1315, 1328 (10th Cir. 2004) (en banc) (per curiam). See Doc. 284.

The Tenth Circuit stated that, in ruling on a motion to enforce, they consider:

"(1) whether the disputed appeal falls within the scope of the waiver of appellate

rights; (2) whether the defendant knowingly and voluntarily waived his appellate

rights; and (3) whether enforcing the waiver would result in a miscarriage of justice."

*Id.* at 1325. Juarez, however, does not address any of these factors. Instead, he claims

the appeal waiver is unenforceable because the one-sided nature of the waiver renders

the plea agreement unconscionable and because the government intended and/or

attempted to breach the plea agreement. *Id.*

At the conclusion of the Sentencing Hearing, the District Court applied the

two-level increase consistent with the government's stipulation and the terms of the

Plea Agreement. The Tenth Circuit reiterated that, Juarez therefore received the

benefit he bargained for under the Plea Agreement. And given these circumstances,

the government's alleged intent or attempt to breach the plea agreement was deemed

to provide no basis to prevent enforcement of the appeal waiver in the plea

agreement. As a result, the Tenth Circuit granted the government's Motion to Enforce the Appeal Waiver and dismissed Juarez's appeal. *Id.*

## III. DISCUSSION

As a preliminary matter, Juarez respectfully requests that this Court be mindful that *pro se* litigants are entitled to liberal construction of their pleadings. See *U.S. v. Hernandez*, 627 F.3d 1331 (10th Cir. 2010) ("*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed."); *Estelle v. Gamble,* 429 U.S. 97, 103 (1976); *Haines v Kerner*, 404 U.S. 519, 520 (1972) (same).

### A.    Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence

This Court has the power to adjust Juarez's sentence. District courts no longer need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release provisions of 18 U.S.C. § 3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies. The reasons that can justify resentencing are not limited to medical, age, or family circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

11

1.   <u>Historical Framework</u>

Congress first enacted the compassionate release provisions in 18 U.S.C. §
3582 as part of the Comprehensive Crime Control Act of 1984. That legislation
provided that a district court could modify a final term of imprisonment when
extraordinary and compelling reasons warrant such a reduction. 18 U.S.C.
§3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons
(BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a
sentencing court had no jurisdiction to modify an inmate's sentence. Congress did not
define what constitutes an "extraordinary and compelling reason," but the legislative
history recognized that the statute was intended, in part, to abolish and replace federal
parole. Rather than have the parole board review for rehabilitation only, Congress
authorized review for changed circumstances:

> The Committee believes that there may be unusual cases in which an
> eventual reduction in the length of a term of imprisonment is justified by
> changed circumstances. These would include cases of severe illness,
> cases in which other extraordinary and compelling circumstances justify
> a reduction of an unusually long sentence, and some cases in which the
> sentencing guidelines for the offense of which the defender was
> convicted have been later amended to provide a shorter term on
> imprisonment. S. Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. § 3582 acts as a "safety valve" for the "modification of sentences"
that would previously have been addressed through the former parole system. *Id.* at

12

121. The provision was intended "to assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and [would allow courts] to respond to changes in the guidelines." *Id*. Thus, sentencing courts have the power to modify sentences for extraordinary and compelling reasons.

### 2.     Section 3582(c)(1)(A) is Not Limited To Medical, Elderly or Childcare Circumstances

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the United States Sentencing Commission. 28 U.S.C. § 994(t) ("The Commission…shall describe what should be considered "extraordinary and compelling reasons" for sentence reduction, including the criteria to be applied and a list of specific examples." Congress provided one limitation to that authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could, however, be considered with other reasons to justify a reduction.

In 2007, the Sentencing Commission defined "extraordinary and compelling reasons" as follows:

(A)    Extraordinary and Compelling Reasons - Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the following circumstances:

(i)     The defendant is suffering from a terminal illness;

(ii)    The defendant is suffering from a permanent physical or
        medical condition, or is experiencing deteriorating physical
        or mental health because of the aging process, that
        substantially diminishes the ability of the defendant to
        provide self care within the environment of a correctional
        facility and for which conventional treatment promises no
        substantial improvement;

(iii)   The death or incapacitation of the defendant's only family
        member capable of caring for the defendant's minor child
        or minor children; and

(iv)    As determined by the Director of the Bureau of Prisons,
        there exists in the defendant's case an extraordinary and
        compelling reason for purposes of subdivision (1)(A).
        USSG §1B1.13, Application Note 1.

As we will see, with the passage of The First Step Act, subparagraph (iv) is no

longer limited by what the BOP decides is extraordinary and compelling.

Historically, the BOP rarely filed motions under § 3582(c)(1)(A), even when

the inmates met the objective criteria for modification. See U.S. Dep't of Justice

Office of the Inspector General, The Federal Bureau of Prisons Compassionate

Release Program (Apr. 2013). The Office of the Inspector General also found that the

BOP failed to provide adequate guidance to staff on the criteria for compassionate

release, failed to set time lines for review of compassionate release requests, failed

to create formal procedures for informing prisoners about compassionate release, and

14

failed to generate a system for tracking compassionate release requests. *Id*. at i-iv.

Congress heard those complaints and in late 2018 enacted The First Step Act.

### 3.   The First Step Act

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among other things, transformed the process for compassionate release. *Id*. at § 603. Now, instead of depending upon the BOP to determine an inmate's eligibility for extraordinary and compelling reasons and the filing of a motion by the BOP, a court can resentence "upon motion of the defendant." A defendant can file an appropriate motion if the he or she has exhausted all administrative remedies or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The purpose and effect of this provision is to give federal courts the ability to hear and resentence a defendant even in the absence of a BOP motion. Congress labeled this change "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018). Senator Cardin noted in the record that the bill "expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as … improving application of compassionate release, and

providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

4.    Juarez Has Exhausted Administrative Remedies

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

Juarez filed a Motion for Compassionate Release to Warden, FPC Yankton and he did not receive any response yet. Because BOP failed to file a motion on Juarez's behalf, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

**B.    Juarez's Current Conditions of Confinement and Health Conditions**

Juarez, age 60, suffers from a progressive disease, from which Juarez may not recover, to wit: Asthma. He also suffers from Chronic Rhinitis, Moderate Alcohol and Cannabis Use Disorder, Mild Stimulant Related Disorder (Cocaine), and eye and

dental problems. In this case, it was believed that Juarez's Asthma was triggered during his incarceration. See Exhibit 1.

**Facts:**

***Asthma***. Asthma is a long-term disease of the lungs. You might hear your doctor call it a chronic respiratory disease. It causes your airways to get inflamed, narrow and swell, and produce extra mucus. This can make breathing difficult and trigger coughing, wheezing, shortness of breath, and chest tightness are classic asthma symptoms.

Asthma attacks can be fatal. A severe asthma attack can prevent you from getting enough oxygen into your lungs and can even stop your breathing. Therefore, severe asthma attack requires emergency medical attention.

***COVID-19***. COVID-19 is the disease caused by the new coronavirus that emerged in China in December 2019. COVID-19 symptoms include cough, fever or chills, shortness of breath or difficulty breathing, muscle or body aches, sore throat, new loss of taste or smell, diarrhea, headache, new fatigue, nausea or vomiting and congestion or runny nose. COVID-19 can be severe, and some cases have caused death.

New York, California and Ohio were among the first to release incarcerated people. Other states have followed, saying it is the only way to protect prisoners, correctional workers, their families and the broader community.

Jails and prisons often lack basic hygiene products, have minimal health care services and are overcrowded. Social distancing is nearly impossible except in solitary confinement, but that poses its own dangers to mental and physical health.

While there is absolutely no evidence to support that any person is more or less likely to be infected [with COVID-19] based on existing medical conditions, Juarez's argues that, first, prisoners experience exponentially higher rates of COVID-19 than the general population. As of June 2020, "[t]he COVID-19 case rate for prisoners was 5.5 times higher than the US population case rate."[3] Second, and more critically, older individuals and individuals with chronic medical conditions are at greater risk of hospitalization and death from COVID-19. For example, the CDC reports that persons aged 40 to 49 are 15 times more likely to be hospitalized and 130 times more likely to die from COVID-19 compared to persons aged 18 to 29 and younger.[4] In other words, Juarez does not only contend that his health conditions increase his risk of getting COVID-19; but also, he contends that those conditions greatly increase the risk that, if contracted, his COVID-19 infection would be severe or even deadly.

*BOP Amid Covid-19*

One consequence of overcrowding is that prison officials have a difficult time providing adequate health care.

---

[3]

Brendan Saloner, *et al.*, *COVID-19 Cases and Deaths in Federal and State Prisons*, J. of the Am. Med. Ass'n (July 8, 2020), https://jamanetwork.com/journals/jama/fullarticle/2768249.

[4]

*Hospitalizations & Death by Age*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last updated May 14, 2021).

In 2011, the U.S. Supreme Court ruled that overcrowding undermined health care in California's prisons, causing avoidable deaths. The justices upheld a lower court's finding that this caused an "unconscionable degree of suffering" in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.

Amid a worldwide pandemic, such conditions are treacherous. Some of the worst COVID-19 outbreaks in U.S. prisons and jails are in places – like Louisiana and Chicago – whose prison health systems have been ruled unconstitutionally inadequate. Criminologists and advocates say many more people should be released from jails and prison, even some convicted of violent crimes if they have underlying health conditions.

The decision to release prisoners cannot be made lightly. But arguments against it discount a reality recognized over two centuries ago: The health of prisoners and communities are inextricably linked. Coronavirus confirms that prison walls do not, in fact, separate the welfare of those on the inside from those on the outside.

C.   **Juarez Has "Extraordinary and Compelling Reasons" For Compassionate Release**

discussed above, the principles for release are no longer limited to BOP guidelines; federal courts have the power to determine what constitutes extraordinary and compelling circumstances.

19

1.      COVID-19 Is a Public Health Disaster That Threatens Vulnerable Incarcerated Persons like Juarez.

The COVID-19 pandemic continues to roil the United States. As of January, 23, 2023, the BOP has 145,356 federal inmates in BOP-managed institutions and 12,875 in community-based facilities. There have been 312 federal inmate deaths and 7 BOP staff member deaths attributed to COVID-19 disease. See https://www.bop.gov/coronavirus/ (last accessed January 23, 2023). Bottom line, Federal facilities are not immune.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. . . . . They are not given tissues or sufficient hygiene supplies"); Joseph A. Bick (2007). *Infection Control in Jails and Prisons*. Clinical Infectious Diseases 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.

"The [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.10

Indeed, as the Second Circuit recently observed, present information about the COVID-19 epidemic and the BOPs' prior failings in 2019 to adequately protect detainees and allow them access to counsel and their families following a fire and power outages suggest that the virus' impact will likely be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

      2.    <u>Juarez's Vulnerability to COVID-19 Due to His High Medical Risk Is an Extraordinary and Compelling Reason That Warrants a Sentence Reduction.</u>

Juarez is particularly vulnerable to COVID-19 because of his Asthma. As the COVID-19 pandemic continues, it potentially poses a particular issue for older people and people with pre-existing medical conditions (such as serious heart condition, lung disease, and autoimmune disease) appear to be more vulnerable to becoming severely ill with the COVID-19 virus.

### Lung Problems, Including Asthma

COVID-19 targets the lungs, so you're more likely to develop severe symptoms if you have preexisting lung problems, such as: Moderate to severe asthma, Chronic obstructive pulmonary disease (COPD), Lung cancer, Cystic fibrosis, Pulmonary fibrosis. In addition to being an asthma trigger, smoking or vaping can harm your lungs and inhibit your immune system, which increases the risk of serious complications with COVID-19.

### Heart Disease, Diabetes and Obesity

People with diabetes, heart disease, high blood pressure or severe obesity are more likely to experience dangerous symptoms if infected with COVID-19. This may be of particular concern in the United States, which has seen increasing rates of obesity and diabetes over the years.

Obesity and diabetes both reduce the efficiency of a person's immune system. Diabetes increases the risk of infections in general. This risk can be reduced by keeping blood sugar levels controlled and continuing your diabetes medications and insulin. Your risk of serious illness may also be higher if you have heart diseases such as cardiomyopathy, pulmonary hypertension, congenital heart disease, heart failure or coronary artery disease.

### How SARS-COV-2 Causes Disease and Death in COVID-19

"You'd think underlying lung problems or immune system problems will be the greatest risk," says Dr. Levitt. "But it seems the biggest risk factors have been hypertension, diabetes and obesity." That has led many scientists to suspect that the profound inflammation seen in severe cases of COVID-19 may be yet another problem linked to SARS-COV-2's fondness for ACE2. People with diabetes, hypertension and heart disease have more ACE2 on their cells as a response to the higher levels of inflammation that come with their condition; ACE2 has an anti-inflammatory effect. When SARS-COV-2 sticks to ACE2 and reduces its ability to do its job, the underlying inflammation gets worse.

When inflammation gets completely out of control the body enters what is called a cytokine storm. Such storms drive the most severe outcomes for COVID-19, including multi-organ failure. There is thus an obvious role for anti-inflammatory drugs. But knowing when to administer them

is hard. Go too late, and the storm will be unstoppable; go too early, and you may dampen down an immune response that is turning the tide. A recent article in the Lancet suggests that it would help if COVID-19 patients were routinely screened for hyper-inflammation to help identify those who might benefit from anti-inflammatory drugs. But not everyone is convinced today's drugs have much to offer. "We tried [a range of anti-inflammatory treatment] and it actually didn't work," says Rajnish Jaiswal, who has been working on the front line of COVID-19 treatment at New York's Metropolitan Hospital.

https://www.economist.com/briefing/2020/06/06/how-sars-cov-2-causes-disease-and-death-in-covid-19.

Due to overcrowding, lack of resources, and little access to medical care, incarcerated people have been at high risk for contracting COVID-19. Now, as the highly transmissible Delta variant circulates widely, they may be even more susceptible to the virus.

***Josh Manson***, a researcher at the UCLA Law COVID Behind Bars Data Project, tells Verywell that there have been few efforts to curb the Delta variant and COVID-19 overall, making prisons deadly places for transmission. "When the pandemic first hit in March 2020, prisons were not taking the situation seriously," Manson says. "We know that it's even more transmissible than it was the first time a year and a half ago. We've seen thousands of people die in jails and prisons."

So far, at least 2,718 people incarcerated in state and federal prisons, including ICE custody, have died of COVID-19, making prisons a lethal setting during the

23

pandemic.[5]

According to Manson, the current death count is an underestimate. "There's evidence emerging that the counts that have been recorded are actually undercounted," Manson explains. "So we don't even know the true totals of how many people died."

> **Homer Venters, MD**, epidemiologist, clinical associate professor at New York University's College of Global Public Health, and former chief medical officer for the New York City jail system, tells Verywell that to track and promote better health outcomes, he believes data should be collected by the CDC and state departments of health.
>
> "Some of the recommendations that I really advocated for in the Biden Harris task force have explicitly called on the CDC and the state department's of health to become much more involved in tracking health outcomes," Venters says.
>
> *Study: COVID-19 Crowdfunding Campaigns Benefited Privileged Groups Most*
> "All health data from prisons right now is really all over the place," Manson adds.
>
> For example, prison systems report vaccination differently. Some prisons have reported the number of incarcerated people who have received only the first dose, while other systems have reported the number of staff and incarcerated people who received both doses.

Hence, it is appropriate for Juarez to be released into an environment where he and his loved ones can control and direct his medical care. It is important for all of

---

[5]

UCLA Law COVID Behind Bars Data Project. National aggregate counts. Updated July 6, 2021.

us to remember that convicted criminals are sent to prison as punishment—not for punishment. People who are severely debilitated or are in the midst of dying are usually no longer a threat to society, and there is not a compelling social advantage to keeping them in prison.

**Note:**        According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.

a.        Based on what we know now, those at high-risk for severe illness from COVID-19 are:
- People 60 years and older
- People who live in a nursing home or long-term care facility

b.        People of all ages with underlying medical conditions, particularly if not well controlled, including:
- Cancer;
- Chronic kidney disease;
- Chronic lung diseases, including COPD (chronic obstructive pulmonary disease), asthma (moderate-to-severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension;
- Dementia or other neurological conditions;
- Diabetes (type 1 or type 2);
- Down syndrome;
- Heart conditions (such as heart failure, coronary artery disease, cardiomyopathies or hypertension);
- HIV infection;
- Immunocompromised state (weakened immune system);
- Liver disease;
- Overweight and obesity;
- Pregnancy;

- Sickle cell disease or thalassemia;
- Smoking, current or former;
- Solid organ or blood stem cell transplant;
- Stroke or cerebrovascular disease, which affects blood flow to the brain; and
- Substance use disorders

are the hallmark of those who are most endangered by the instant pandemic. These are "extraordinary and compelling reasons" for his release. See Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), see Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Juarez's high susceptibility to COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like BOP to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Juarez suffers from an ailment that have already been identified as "high risk," this Court should

find that Juarez's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. Senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible." And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

Finally, in the last few years, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the

incarcerated population and thus reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island. Approximately 1,700 inmates have been released from Los Angeles County Jails, and 1,000 inmates are to be released from New Jersey jails. Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

        3.      <u>Courts Have Granted Compassionate Release in Light of the Instant Pandemic.</u>

Juarez urges the Court to consider the following compassionate release grants:

<u>*United States v. Williams, 2020 WL 7312177, at *1 (C.D. Ill. Dec. 11, 2020)*</u>
- FCI Terre Haute;
- Release date is August 2026, pleaded to drugs in 2018 and 924(c), got two 60 year terms consecutive for 120 months; and
- Emphysema, COPD, asthma, hypertension, type 2 diabetes, chronic renal failure, obesity

<u>*United States v. Pape, 2020 WL 6042397, at *1 (D. Minn. Oct. 13, 2020)*</u>
- Pape suffers from asthma and a suppressed immune system due to his prolonged use of a corticosteroid inhaler. Pape also has a history of bronchitis, chronic obstructive pulmonary disease ("COPD"), and hypertension;
- 180 month sentence for felon in possession of firearm, has served 8 years since 2012, stole from a car and there was a gun in the purse, career offender; and
- FMC Rochester, release date March 2025.

*United States v. Solis, 2020 WL 5909570, at \*1 (S.D. Cal. Oct. 6, 2020)*
- Solis is 41 years old and is obese.
- He has asthma that must be managed with an inhaler, as well as a history of deep vein thrombosis and pulmonary embolism. Solis previously suffered a blood clot in his calf that affected his lungs and led to his hospitalization.
- Solis experienced COVID-19 symptoms while at FCI Lompoc, including throbbing pain in his lung, but was not tested.

*United States v. Gilchrist, 2020 WL 5408138, at \*1 (D. Kan. Sept. 9, 2020)*
- FCI Yazoo City-Medium, sentenced to 180 months
- Asthma, release date September 2025
- Medical expert telemedicine with inmate, uses inhaler, moderate enough

Section 1B1.13 has not been updated to reflect pursuant to the 2018 First Step Act, hence, defendants now have the ability to bring such motions directly. This anomaly has given rise to a debate concerning whether and to what extent § 1B1.13 applies to motions filed by defendants, with several circuits recently holding that § 1B1.13 applies only to motions filed by the Bureau of Prisons, and not to motions filed by defendants on their own behalf. See *United States v. McCoy*, Nos. 20-6821, 20-6869, 20-6875, 20-6877, 2020 WL 7050097, at \*6-7 (4th Cir. Dec. 2, 2020); *United States v. Jones*, No. 20-3701, 2020 WL 6817488, at \*8-9 (6th Cir. Nov. 20, 2020); *United States v. Gunn*, No. 20-1959, 2020 WL 6813995, at \*2 (7th Cir. Nov. 20, 2020); *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020).

### 4.   Juarez's Remarkable Rehabilitation

It is essential to note that since Juarez's incarceration began, he has taken numerous steps to attempt to improve himself in "post-conviction rehabilitation." See Exhibit 2. Throughout the time he has spent in prison, Juarez has worked long and hard and diligently at his rehabilitation. Hence, there can be no genuine safety concerns on his release. His extraordinary rehabilitation shows that he is ready for re-entry.

In Juarez's more than 60 months of imprisonment, he managed to maintain clear conduct in the BOP, with a PATTERN score of LOW risk for recidivism. Also, it was noted that there were no mental health or discipline concerns reported. He received good work reports from staff supervising the R&D Orderlies. He has matured from a man pursuing a lawless lifestyle, to a reflective, empathetic matured responsible adult.

Under 18 U.S.C. § 3582(c)(2), to modify Juarez's sentence, taking into account the advisory nature of the guidelines after *Brooker* and the considerations set forth in 18 U.S.C. § 3553(a). The court should find that a sentence of time served is sufficient, but not greater than necessary, and accounts for the sentencing factors the court must consider pursuant to 18 U.S.C. § 3553(a), specifically deterrence, protection of the public, and respect for the law.

Finally, the combination of factors, health conditions, COVID-19 risk, as well as post-sentencing rehabilitation, and the changing sentencing landscape justify granting compassionate release to Juarez. More so, his BOP record does not show that he is violent or a threat to public safety.

If granted compassionate release, Juarez will reside with his aunt, Simona Villalpando in 1572 S. Alcott St., Denver, Colorado 80219– where he will be able to isolate himself and take the same precautionary measures that all Americans are taking: frequent hand washing, sanitizing his living space, and seeking medical care as necessary. See Exhibit 2. None of these precautions are available in prison. Juarez could stay with his aunt with the support that he needed until he's able to have his own place. Further information about these release plans upon request.

## IV. <u>CONCLUSION</u>

For the above and foregoing reasons, Juarez prays this Court would consider his Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018, based upon the fact that he has exhausted available administrative remedy and he has met the "extraordinary and compelling reasons" requirement.

Respectfully submitted,

Dated: February 7, 2023

JOHNNY JOE JUAREZ
REG. NO. 44244-013
FPC YANKTON
FEDERAL PRISON CAMP
P.O. BOX 700
YANKTON, SD 57078
Appearing *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2023, a true and correct copy of the above and foregoing Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018 was sent via U. S. Mail, postage prepaid, to James R. Boma, at U.S. Attorney's Office - Denver, 1801 California Street, Suite 1600, Denver, CO 80202.

JOHNNY JOE JUAREZ

JOHNNY JOE JUAREZ
REG. NO. 44244-013
FPC YANKTON
FEDERAL PRISON CAMP
P.O. BOX 700
YANKTON, SD 57078

February __7__, 2023

Mr. Jeffrey P. Colwell Esq.
Clerk of Court
U.S. District Court
District of Colorado
Denver Division
901 19th Street
Denver, CO 80294

     RE:   *Juarez v. United States*
            Crim No. 1:17-cr-00235-PAB-1

Dear Mr. Colwell:

     Enclosed please find and accept for filing Movant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018. Please submit this document to the Court.

     Thank you for your assistance in this matter.

                    Sincerely,

                    JOHNNY JOE JUAREZ
                    Appearing *Pro Se*

*Encl. as noted*



Johnny Joe Juarez 44244-013
Federal Prison Camp
P.O. Box 5700
Yankton, SD 57078

Mr. Jeffrey P. Colwell Esq
Clerk of Court
U.S. District Court
District of Colorado
Denver Division
901 19th Street
Denver, Co 80294

CERTIFIED MAIL

7021 2720 0002 0375 8305

7021 2720 0002 0375 8305

